ANDREWS & BOERUM *against* THE MARINE INSURANCE
COMPANY.

A vessel in-  THIS was an action on a policy of insurance, on the schooner
sured   from
*Charleston to*  *Maria*, from *Charleston, S. C.* to *New-York*, on account of the
*New-York*,
was,   during  plaintiffs, and *M. & A. Clark*, the latter being also master of the
the voyage,
stranded and  vessel.
lost on *Little*
*Egg Harbour*    The cause was tried at the *New-York* sittings, in *June*, 1811,
*Beach*,   on
*Monday*, the  before Mr. Justice *Thompson;* and a verdict taken for the plain-
26th of *March*,
at 2 *A. M.*  tiffs, subject to the opinion of the court, on the following case.
about 90 miles
from   *New-*   The vessel sailed on the voyage insured, the 18th of *March*,
*York*.   The  1811, with a cargo of cotton and rice; and on *Monday*, the 26th
insurance was
effected by A.  of *March*, at 2 *A. M.* was lost on *Little Egg Harbour Beach*,
and B. part  about 90 miles from the city of *New-York*. The insurance was
owners,   for
themselves  effected on the 9th of *April* following, by the plaintiffs.
and   the
other owners,   It was not pretended, that the plaintiffs had any knowledge of
of which the
master   was  the loss of the vessel, at the time the insurance was made; and
one,   on the  the only question was, whether *A. Clark*, the master and part
9th of *April*
following; but  owner, had been guilty of such *gross negligence*, in not commu-
A.   and B.
knew nothing
of the loss
until after the insurance. The master was so much hurt, at the time of stranding, as not to be
able to attend to business for two or three days; but he made immediate inquiry after the
means of communicating information of the loss to *New-York*, and found that the only convey-
ance, by land, was the mail, from a place 10 miles distant from the wreck, and which went only
once a week, and had previously left the place on the evening of the 26th, and would not leave
it again until the *Monday* following. Several vessels lay near the place of the wreck bound to
*New-York*, but were detained by head winds. With a fair wind, a vessel would arrive at *New-*
*York* in one day. The master having put the cargo which had been saved on board of three
small vessels, embarked in one of them, on *Saturday*, the 31st of *March*, but, on account of con-
trary winds, did not arrive until the 11th of *April*.

It was held that there was no actual fraud, and that the master, not knowing of any intention
to effect an insurance, was bound to use no more than ordinary diligence; and that under the
circumstances, there was not such gross negligence, or constructive fraud, as would vacate the
policy.

nicating intelligence of the loss to the other part owners as would vacate the policy.

When the vessel went ashore, the master was knocked down by the *tiller*, and so much injured that he was carried to a place called *Hawkins*, eight miles distant from the wreck, and was there for several days disabled. The witness, one of the seamen, did not know of any opportunity to *New-York;* but there were several vessels, at the time, at *Little Egg Harbour*, ready to sail, but were prevented from sailing ; and none did sail, until the one in which he came up to *New-York*, which arrived there on the 11th of *April*.

On the morning of the shipwreck, the master inquired of an inhabitant of the place whether there was any post-office in the vicinity, and expressed great anxiety to write to *New-York;* and he was informed that the nearest post-office was at *Tinkerton*, 10 miles distant, but that the post left that place only once a week, on *Monday* morning ; and that it was then too late for that post day, as the mail had already left *Tinkerton* for *New-York*.

On *Tuesday* the captain went to a place about two miles distant, in a carriage, to make a protest; and on *Wednesday* he went to the wreck. A person might have been easily hired to carry a letter to the post-office at *Tinkerton*. The post went by the way of *Philadelphia*, where it arrived on *Wednesday* in each week, and could not reach *New-York* before the next day; but a vessel leaving *Little Egg Harbour*, with a wind tolerably fair, would reach *New-York* in one day. On *Saturday*, the 31st of *March*, the captain put all the cargo saved on board of three small vessels, embarked in one of them for *New-York*, and, having proceeded about ten miles, they were obliged to anchor, on account of head winds; and, while so detained, the captain might have forwarded a letter to *New-York*, from the place opposite the vessel. On account of contrary winds, he did not arrive at *New-York* until the 11th of *April*.

A master of a coasting vessel testified that he was at the wreck the day after the vessel went ashore, and inquired of Captain *Clark* if he had any freight for *New-York;* and he told the witness, that he had already engaged vessels to carry the cargo to *New-York*. The witness mentioned that his was a fast-sailing vessel, and would reach *New-York* first. She lay out of the mouth of the harbour, and sailed the 2d, and arrived at *New-York* on the 5th of *April ;* but the witness said that he did not

mention the loss of the *Maria* to any person, though it was talked of among the crew on board of his vessel.

In the *New-York Gazette*, published on the 29th of *March*, the arrival of the schooner *Emily*, in 15 days from *Charleston*, was mentioned ; and, among the occurrences of the voyage, it was stated, that on *Wednesday* preceding they saw a schooner on shore, with yellow sides, on *Little Egg Harbour Beach*, with cotton floating around her.

*D. B. Ogden*, for the plaintiffs.

*Colden* and *Sampson*, contra.

*Per Curiam.* There is no trace of actual fraud in this case; and it is a question of constructive fraud merely, on the ground that Captain *Clark* did not use due diligence in communicating intelligence of the loss to his partners in *New-York*. It does not appear that Captain *Clark* had directed insurance, or was apprized of any intention of the plaintiffs, to cause insurance to be made. As we cannot, therefore, perceive any interested motive in him to withhold the intelligence, the case did not seem to require that extreme diligence that would have been due, had he known that application for insurance was pending. We ought, then, to exact from him, as part owner, that ordinary diligence only which the nature of such mercantile concerns, and common prudence and discretion would demand. Any thing like gross negligence, in communicating with his partners in such a crisis, would look like design, and justify the inference of fraud : but the circumstances of the case are proof of ordinary diligence. The captain was much injured by the stranding of the vessel, and was, for some time, disabled from bestowing attention to his business. He, however, made instant and anxious inquiries about the means of communicating with *New-York*, by the mail, and was informed that no opportunity would occur, through the next post-office, which was ten miles off, under a week from that time. He had then good reason to believe he would himself arrive in *New-York*, with the cargo saved, before a letter would reach *New-York* by the mail. He had laden his cargo on board of other vessels, by *Saturday* next after the shipwreck, and embarked for *New-York*, and a fair wind would have carried him there in one day. He advanced about ten miles the same day, and was then detained by contrary winds, so as not to be able to arrive in *New-York* in eleven or twelve days.

Under these circumstances, there is no ground to charge him with a want of ordinary diligence, and the plaintiffs are entitled to judgment.

ALBANY,
Jan. 1812.

Judgment for the plaintiffs.